# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RENE ARTURO LOPEZ**, **AQUILLA A. D.** **TURNER, MOHAMMED BARAKATULLAH** **ABDUSSALAAM, & BAYENAH NUR** | ) ) ) |
| Addresses: <u>Lopez & Turner</u>: 1025 S. Hoga Rd., Sterling, VA 21064; <u>Abdulsalam</u>: 1705 Rivermont Ave., Lynchburg, VA 24503; <u>Nur</u>: 165-2 Piedmont Pointe, Mooresville, NC 28115 | ) ) ) ) ) |
| *Plaintiffs*, | ) |
| *-v.-* | ) ) |
| **COUNCIL ON AMERICAN-ISLAMIC** **RELATIONS ACTION NETWORK, INC.; JOHN** **DOE COMPANIES 1-50; ZAHARA INVESTMENT** **CORPORATION; GREATER WASHINGTON LLC** **DELAWARE; MORRIS DAYS, KHALID IQBAL,** **TAHRA GORAYA, IBRAHIM HOOPER, AMINA** **RUBIN, NIHAD AWAD, PARVEZ AHMED,** **KHADIJAH ATHMAN, NADHIRA AL-KHALILI,** **JOHN DOE BOARD MEMBERS 1-200 & JANE** **DOE BOARD MEMBERS 1-200; and JOHN** **DOES 1-100 & JANE DOES 1-100,** | ) ) ) ) ) ) ) ) ) ) ) |
| Known Addresses: Council on American-Islamic Relations Action Network, Inc., <u>Zahara Investment Corporation</u>, & <u>Greater Washington LLC of Delaware LLC</u>: 453 New Jersey Ave SE, Washington, DC 20003 | ) ) ) ) ) ) ) |
| *Defendants*. | ) |

**CIVIL ACTION NO:_____**

  **ALLEGING:**

  **RICO**

  **FRAUD**

  **DC CONSUMER PROT PROC ACT**

  **VA CONSUMER PROT ACT**

  **CONVERSION**

  **BREACH OF FIDUCIARY DUTIES**

  **INFL OF EMOTIONAL DISTRESS**

  **UNJUST ENRICHMENT**

 

**JURY TRIAL DEMANDED**

1

Plaintiffs, by their attorneys, allege on information and belief based, *inter alia*, on the investigation of their legal counsel, except as to those allegations which pertain to the plaintiffs, which are based upon personal knowledge and belief, as follows:

### NATURE OF THE ACTION

1.      This is a cause of action alleging violations of the federal Racketeer Influenced Corrupt Organizations Act ("RICO")[1]; the District of Columbia Consumer Protection Procedures Act ("DCCPPA"); the Virginia Consumer Protection Act ("VCPA"); breach of fiduciary duty; conversion; unjust enrichment; and intentional infliction of emotional distress on behalf of plaintiffs who sought legal representation from defendant Council on American-Islamic Relations Action Network, Inc., formerly known as Council on American-Islamic Relations, Inc.  ("CAIR National"), by contacting CAIR National through the CAIR National's Herndon, Virginia branch office ("CAIR-VA") from June 2006 until approximately February 10, 2008. These plaintiffs are alleging that CAIR National and CAIR-VA, together with certain named and as yet unnamed employees, directors, agents, co-conspirators, and aiders and abettors engaged in common law fraud and federal and state statutory criminal fraud, thereby damaging these plaintiffs. These plaintiffs further allege that these defendants then conspired to cover-up their fraudulent acts and committed additional

---

[1] *See* Appendix I for a listing of all defined terms and acronyms, their full descriptions, and the page of the Complaint on which they are first defined.

crimes in furtherance of this conspiracy including obstruction of justice and bribery.

2.      This action arises out of a scheme by CAIR National, a national public interest law firm to cover-up a wide reaching fraud by CAIR-VA, its branch office in Herndon, Virginia. Upon information and belief, CAIR National opened up its CAIR-VA office sometime in December 2004.  In or about in June 2006, CAIR-VA employed Morris J. Days III ("Days") as its "resident attorney" and "manager" of its civil rights department to provide legal representation to Muslims complaining of various civil rights abuses.

3.      Days was not and never has been an attorney. CAIR knew or should have known that Days was committing fraud by holding himself out as a CAIR attorney.

4.      CAIR-VA also knew, at least by November 2007, on subsequent occasions later that same year, and in early 2008, that Days fraudulently obtained money from CAIR clients for CAIR's legal representation notwithstanding CAIR's stated policy to provide pro bono legal services to the public. Subsequent to this discovery and for months thereafter, CAIR made no attempt to contact its clients to inform them of this fraudulent conduct nor did CAIR attempt to make restitution to its clients for these fraudulent legal fees. Further, CAIR made no effort to contact any government authorities regarding Days' fraudulent conduct, thereby ratifying the scheme.

5. After many complaints by CAIR clients of inadequate representation, CAIR finally terminated Days' employment in February 2008. At least by March 2008, CAIR-VA knew that Days had never been to law school and was not an attorney. By this time, CAIR knew that Days had criminally defrauded at least 30 clients by taking funds under false pretenses. Further, CAIR knew that Days had represented over 100 CAIR clients as CAIR's "resident attorney" even though he was not licensed to practice law.

6. Upon discovering Days' fraudulent actions, CAIR made no effort to contact any government agencies to report the criminal fraud, nor did CAIR make any effort to contact their clients to inform them of the fact that Days was not a licensed attorney. CAIR made no effort to inform their clients orally or in writing that they should seek independent legal counsel to ascertain if they had viable claims against CAIR and/or Days nor did CAIR attempt to provide restitution to their clients. Instead, CAIR and its employees at CAIR-VA and at CAIR National conspired to defraud their clients by telling them that Days was never an employee of CAIR, that he was acting on his own or as an "independent contractor", and that they (i.e., the defrauded clients) should seek redress from Days himself.

7. CAIR and its employees knew that the representations set forth above were false insofar as CAIR's publicity and representations about Days was intended to and did in fact establish in the minds of both the general public and the plaintiffs that Days was an employee and/or agent of CAIR acting in his

capacity as both a "resident" CAIR attorney and the "Civil Rights Manager" of CAIR-VA. Days in fact acted as an employee of CAIR-VA. CAIR and its employees intended that the plaintiffs would in fact rely upon these false representations.

8.    Finally, several weeks after terminating Days, it became clear to CAIR that some of its Muslim clients would cause damage to CAIR's reputation in the Muslim American community and negatively impact on CAIR's ability to raise funds through charitable donations. Consequently, CAIR decided that it would seek to provide full or partial restitution to some of the more outspoken and threatening clients but not all.

## JURISDICTION AND VENUE

9.    This Court has federal subject matter jurisdiction of the RICO claim as a federal question pursuant to 28 U.S.C. §§ 1331 and 18 U.S.C. § 1964(c) (civil remedies for RICO violations); and supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367(a).

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965.

## PARTIES

11.    Defendant CAIR National has at all relevant times been a not-for-profit company formed and conducting its affairs principally in the District of Columbia.. Upon information and belief, CAIR National's authority to operate as a corporation in the District of Columbia was revoked on September 8, 2008 and

that CAIR National's ongoing operations and business constitutes a misdemeanor punishable by a fine of not more than $500 or by imprisonment not exceeding one year, or both, pursuant to D.C. Code § 29-301.87.

12.    Defendants John Doe Companies 1-50 are as yet to be identified "chapters" and "offices" of CAIR National, which, upon information and belief, have been formed under a variety of company names to act as alter egos, controlled subsidiaries, co-conspirators, and/or aiders and abettors of CAIR National, and as such have participated in the wrongful acts alleged herein and are jointly and/or severably liable for the wrongful acts alleged herein. Upon further discovery, plaintiffs will seek to amend this Complaint to state the true names and capacities of these defendants when the relevant information has been obtained.

13.    Defendant Zahara Investment Corporation ("Zahara") has been at all relevant times a corporation formed and conducting its affairs principally in the District of Columbia and is a subsidiary of CAIR National. At all relevant times Zahara was incorporated and doing business in Washington, D.C. Upon information and belief, Zahara's authority to operate as a corporation in the District of Columbia was revoked on September 11, 2008 and that Zahara's ongoing operations and business constitutes a misdemeanor punishable by a fine of not more than $500 or by imprisonment not exceeding one year, or both, pursuant to D.C. Code § 29-301.87.

14.     Upon information and belief, CAIR National has exercised full control over Zahara for its own benefit and purposes and has treated Zahara as an alter ego of CAIR National and is jointly and/or severably liable for the wrongful acts alleged herein. (Unless Zahara is separately identified in context, all references to CAIR National shall include Zahara.) CAIR National uses Zahara as a holding company for CAIR National real estate assets.

15.     Defendant Greater Washington LLC of Delaware ("GW LLC") has been at all relevant times a company incorporated in Delaware but with its principal place of business in the District of Columbia. Upon information and belief, CAIR National has exercised full control over GW LLC for its own benefit and purposes and has treated Zahara as an alter ego of CAIR National and is jointly and/or severably liable for the wrongful acts alleged herein. (Unless GW LLC is separately identified in context, all references to CAIR National shall include GW LLC.) CAIR National uses GW LLC as a holding company for CAIR National real estate assets.

16.     Defendants Khalid Iqbal, Tahra Goraya, Ibrahim Hooper, Amina Rubin, Nihad Awad, Parvez Ahmed, Khadijah Athman, and Nadhira al-Khalili have been at all relevant times employees, officers, directors, agents, and/or representatives of CAIR National and upon information and belief have conspired to commit the wrongful acts alleged here and are jointly and/or severably liable for the wrongful acts alleged herein.

17.    Defendants Days and Khalid Iqbal were at all relevant times employees, managers, and/or agents of CAIR-VA.

18.    Defendants John Doe Board Members 1-200 and Jane Doe Board Members 1-200 are as yet to be identified directors, trustees, and/or managing members on the boards of directors, boards of trustees, and/or management committees of CAIR National, GW LLC, Zahara, CAIR-VA, and/or John Doe Companies 1-50, which, upon information and belief, have been at all relevant times individuals with authority to control the conduct of CAIR National, GW LLC, Zahara, CAIR-VA, and/or John Doe Companies 1-50, and as such have conspired to commit the wrongful acts alleged herein and are jointly and/or severably liable for the wrongful acts alleged herein. Upon further discovery, plaintiffs will seek to amend this Complaint to state the true names and capacities of these defendants when the relevant information has been obtained.

19.    Defendants John Does 1-100 and Jane Does 1-100 are as yet to be identified officers, employees, agents, co-conspirators, and/or aiders and abettors of CAIR National, GW LLC, Zahara, CAIR-VA, and/or John Doe Companies 1-50, which, upon information and belief, have been at all relevant times individuals with authority to carry out the conduct of CAIR National, GW LLC, Zahara, CAIR-VA, and/or John Doe Companies 1-50, and as such have conspired to commit the wrongful acts alleged herein and are jointly and/or severably liable for the wrongful acts alleged herein. Upon further discovery, plaintiffs will

seek to amend this Complaint to state the true names and capacities of these defendants when the relevant information has been obtained.

20.    Plaintiffs Rene Arturo Lopez ("Lopez"), Aquilla A. D. Turner ("Turner"), Mohammed Barakatullah Abdussalaam ("MB"), and Bayenah Nur ("Nur") have been at all relevant times citizens of Virginia (with the exception of Nur who moved to North Carolina and currently resides there) who retained CAIR and Days to represent their respective interests in legal matters relating to immigration status, divorce proceedings, hostile work environment, and employment discrimination, respectively.

## FACTUAL BASIS FOR CLAIMS

### THE DAYS FRAUD SCHEME

21.    CAIR National represents itself to the public and operates in fact as a public interest law firm (hereafter "PILF") operating nationally through regional and local branch offices (collectively referred to as "CAIR"). It purports to advocate and litigate on behalf of Muslims in the U.S. to protect their civil liberties.

22.    CAIR National promoted Days to the public through various publications distributed through the United States Postal Service (hereafter "USPS") and through CAIR National's web site as a well-respected and publicly honored "resident attorney," and as the "manager" of the CAIR-VA "civil rights department." At all relevant times, CAIR National and CAIR-VA knew or should have known by the exercise of ordinary due diligence that Days was not actually

9

a lawyer and was perpetrating a massive fraud on the readers of its website and promotional materials.

23.     Days was initially employed by CAIR-VA in June 2006. Attached hereto as Exhibit I and incorporated herein by this reference is a true and correct copy of a CAIR-VA publication distributed by CAIR through the USPS in or about March – May 2007. Attached hereto as Exhibit II are true and correct copies of two articles published on the CAIR National website posted in or about December 2007 and remaining on the CAIR National website until at least September 2, 2008 when they were copied for inclusion herein.

24.     In this capacity and beginning in June 2006, Days worked at the CAIR-VA office, conducted client intake for CAIR-VA to provide legal representation as a licensed attorney to the aggrieved members of the public, entered into agreements to represent clients on behalf of CAIR as a CAIR attorney, and corresponded by use of the USPS and interstate faxes and by telephone utilizing interstate wires with a variety of government agencies, private corporations, and individuals as a CAIR attorney on behalf of CAIR clients utilizing CAIR-VA stationery and identifying himself as a CAIR attorney. Upon information and belief, Days represented well over 100 individual clients on behalf of CAIR.

25.     Days, however, was not and is not a lawyer. He never attended law school nor was he licensed as an attorney to practice law in any jurisdiction in the United States. CAIR knew or should have known that Days was not a lawyer

10

when it hired him. The unauthorized practice of law is a criminal offense in the Commonwealth of Virginia (hereafter "the Days Fraud Scheme").

26.     In addition, Days charged money for the CAIR legal services rendered by him and CAIR-VA staff from many of the CAIR clients. Upon information and belief, more than 30 clients paid legal fees to Days in reliance on the Days Fraud Scheme for legal services ranging from several hundred dollars to thousands of dollars each.

27.     Days knowingly, willfully, and with the specific intent to defraud CAIR clients, represented that he was a competent, licensed attorney.

28.     The CAIR clients who retained CAIR and Days to represent them as legal counsel reasonably and justifiably relied upon CAIR and Days' public representations that CAIR and Days would competently represent them in their legal matters.

29.     The Days Fraud Scheme violated both the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, in that the scheme was intended to fraudulently obtain money from persons through the use of the USPS and interstate wire communications (the latter through the CAIR National website, telephone communications from the Washington D.C. office of CAIR National and from CAIR National officials in Maryland to the victims/clients in Virginia and North Carolina and the transmission of e-mail messages and telephone calls back and forth from CAIR National in Washington D.C. to CAIR-VA in Herndon, Virginia).

30.    The Days Fraud Scheme was a violation of the Virginia criminal fraud statute, Va. Code Ann. § 18.2-178. The Virginia criminal code provides that violations of § 18.2-178 are punishable by a term of imprisonment of not less than two years nor more than 10 years and a fine of not more than $100,000. Va. Code Ann. § 18.2-10(d).

31.    At all relevant times, defendant  Khalid Iqbal ("Iqbal") was an official, authorized representative, and managing director of CAIR-VA, defendant CAIR National, and defendant Zahara. Upon information and belief, Iqbal reported to his superiors at CAIR National and his actions as the authorized representative of CAIR-VA were controlled by CAIR National.

32.    Iqbal knew that Days collected legal fees from CAIR clients in violation of CAIR's policy to represent its clients *pro bono* at least by November 2007. Neither Iqbal nor CAIR made any effort at that time or in the months following this discovery to inform CAIR clients that Days had criminally defrauded them. By his acquiescence in and joining the Days Fraud Scheme, Iqbal entered into a conspiracy with Days and others, detailed below, to cover-up the Days Fraud Scheme and to further perpetrate it.

33.    At this time, CAIR-VA intentionally, recklessly, and/or negligently continued to employ Days and CAIR National and CAIR-VA intentionally, recklessly, and/or negligently continued to represent to the public and to the plaintiffs that Days was a competent, professional, and accomplished attorney.

34.     CAIR-VA did not terminate Days' employment until February 10, 2008.

35.     Upon information and belief, Iqbal and other employees of CAIR-VA had received many complaints from CAIR clients about Days' malfeasance and performance in handling their respective cases. After CAIR terminated Days' employment, the complaints increased and CAIR had substantial and overwhelming evidence that Days had continued to take legal fees from CAIR clients during his employment as a CAIR attorney and had performed no legal services or had inadequately represented their interests

36.     At all relevant times, defendant  Nihad Awad aka Nihad Hammad ("Awad") was an employee and the executive director of CAIR National and an official, director, and authorized signatory for GW LLC. At all relevant times, defendant  Parvez Ahmed ("Ahmed") was the chairman of the board of CAIR National. At all relevant times, defendant Tahra Goraya ("Goraya") was an employee and the national director of CAIR National. At all relevant times, Khadijah Athman ("Athman") was an employee and the manager of the "civil rights" division of CAIR National. At all relevant times, Nadhira al-Khalili ("Khalili") was an employee and in-house legal counsel for CAIR National. At all relevant times, defendant Ibrahim Hooper ("Hooper") was an employee and the director of communications of CAIR National. At all relevant times, defendant Amina Rubin ("Rubin") was an employee and coordinator of communications.

Defendants Iqbal, Awad, Goraya, Athman, Khalili, Hooper, and Rubin shall be referred to collectively as "CAIR National Management".

37.    By several interstate emails and telephone calls from CAIR-VA to CAIR National, and in furtherance of the Days Fraud Conspiracy and its cover-up, Iqbal informed Ahmed, Awad, Goraya, and other officials of CAIR National of the Days Fraud Scheme on or about February 8, 2008 and continuing for several weeks thereafter and asked for instructions on how to proceed. Upon information and belief, Ahmed, Awad, Goraya and/or other officials of CAIR informed Athman and Khalili of the Days Fraud Scheme soon thereafter.

38.    Upon and information and belief, in or about February 2008, defendants Iqbal, Ahmed, Awad, Goraya, Athman, and Khalili, (hereafter "the Conspirators") agreed to acquiesce  in the Days Fraud Scheme by taking affirmative steps to conceal it from the victims including the plaintiffs.  At all times each knew that concealing the Days Fraud Scheme would require further uses of the USPS and wires to make false representations to the victims, to lull them into a false sense of security about the status of their pending legal matters and not to report the Days Fraud Scheme to state or federal authorities or to the media.

39.    Accordingly, all of the Conspirators agreed to mislead the victims of the Days Fraud Scheme, including the plaintiffs, by simply telling them that Days no longer worked at CAIR without explaining to their clients/victims that Days was in fact not a lawyer and that whatever money he had taken from them

for legal fees and costs had been part of the Days Fraud Scheme. All the Conspirators told the clients/victims was that they would have to speak to Days directly.

40.    Thus, during the months February through September 2008 the Conspirators agreed through interstate emails and telephone calls between the CAIR National offices in Washington, D.C. and the CAIR-VA offices in Herndon, Virginia, to conceal from the clients/victims the crucial fact that Days was not a lawyer. Had the Conspirators at least told the victims/clients this, the clients could have obtained new counsel promptly in their pending legal matters in which Days had been involved.

41.    Upon information and belief, as the complaints mounted over time, the Conspirators further agreed to (a) ignore the least vocal and threatening CAIR victims/clients; (b) tell the more vocal and persistent CAIR victims/clients seeking some responsible and professional legal representation or recompense simply that Days was "no longer at the CAIR-VA office" and that their only recourse was to contact Days; (c) agree to appease the most adamant and threatening CAIR victims/clients with partial restitution of their legal fees; (d) fail to disclose the criminal fraud of its CAIR clients to any law enforcement or other government agency.

42.    As set forth above, the Conspirators agreed to pay restitution to the most vocal, angry, and threatening CAIR clients/victims for their actual out-of-pocket expenses incurred in paying the CAIR-Days' legal fees but demanded that

15

the CAIR clients/victims execute a document titled "Voluntary Agreement and Release of Claims" (hereinafter the "Release of Claims Document"). A true and correct copy of the form of the Release of Claims Document is attached hereto as Exhibit III and incorporated herein by this reference. The Release of Claims Document purports to release CAIR from any and all liability arising out of its prior or future representation of former or current clients.

43.    Upon information and belief, various former or current clients who received some amount of restitution from CAIR signed the Release of Claims Document (the "Settling Clients").

44.    Upon information and belief, at no time did the Conspirators or CAIR advise the Settling Clients/victims in writing in advance of entering into the Release of Claims Document that they should seek independent legal counsel or that CAIR and its attorneys were in an adversarial position to the Settling Clients.

45.    The Release of Claims Document purports to impose a duty on the Settling Clients/victims not to disclose to any third party the content of the Release of Claims Document or the events relating to the above-described criminal fraud which led to the signing of the Release of Claims Document (the "Silence Clause"). The Silence Clause on its face prohibits the Settling Clients from disclosing the CAIR and Days criminal fraud to law enforcement personnel and even to their own retained independent legal counsel if retained subsequent to signing the Release of Claims Document.

16

46.    The Silence Clause is unlike almost all typical confidentiality provisions in settlement agreements. First, the Silence Clause relates not to a typical contract or tort claim affecting only the private, civil interests of the parties at loggerheads but to the Days Fraud Scheme, a criminal fraud arising out of a fiduciary relationship between Days, CAIR-VA, CAIR National, and the client/victims.

47.    Second, the Silence Clause provides no exceptions for responding to governmental or court-authorized legal inquiries or in the event the information subject to the Silence Clause is otherwise made public by a third party. Third, the Silence Clause is imposed by CAIR as a PILF on former and current clients/victims in an adversarial position to CAIR. Fourth, CAIR knew that many of its aggrieved Settling Clients/victims were in desperate situations and that they were in manifestly unequal bargaining positions and, upon information and belief, unrepresented by independent legal counsel. Fifth, the Silence Clause is a classic case of overreaching by a fiduciary in a position to take advantage of a lesser informed client in that the Silence Clause is part of an agreement that purports to release CAIR as a PILF for future claims of breach of contract, malpractice, or breach of fiduciary duty arising out of the subject matter of the Release of Claims Document. And sixth, the Silence Clause effectively prevents the Settling Clients from disclosing this matter publicly and thereby triggering the discovery of the full breadth of the Days Fraud Scheme and identifying all of the CAIR clients victimized and silently suffering the

consequences because they have relied on CAIR's false representations that their only recourse was to track down "attorney" Days and seek relief from him.

48.     The Release of Claims Document further states that the Settling Clients agree that if the Settling Clients breach the Silence Clause, CAIR will be entitled to "Damages in the amount of $25,000.00" (the "Liquidated Damages Clause"). The Liquidated Damages Clause was inserted by agreement of the Conspirators to concretize the fear and intimidation experienced by the Settling Clients so that they would not expose the Days Fraud Scheme.

49.     The Silence Clause is Draconian and unconscionable in its scope and in its intended effect to frighten and intimidate the Settling Clients/victims who were not represented by independent legal counsel.

50.     Upon information and belief, the Conspirators and CAIR National Management, conspired to close down CAIR-VA to further the cover-up of the Days Fraud Scheme.

51.     Upon information and belief, in some cases but not all, CAIR referred the client/victims to outside attorneys. Upon information and belief, CAIR contacted the outside legal counsel to whom CAIR had referred the CAIR clients and conspired with them so as to prevent the CAIR clients from suing CAIR and/or lodging criminal and/or bar complaints against CAIR.

52.     On or about June 2, 2008, just prior to the final closing of the CAIR-VA offices, defendant Khalili, who acts as CAIR's "national legal counsel", came to the offices at CAIR-VA, met with Iqbal and discussed with Iqbal and other

CAIR-VA personnel various legal matters relating to CAIR clients and specifically about the Days Fraud Scheme. Khalili then had various files and computer discs which included evidence and documents relating to the Days Fraud Scheme loaded into her car and drove off with them in order to cover up the Scheme.

### THE PLAINTIFFS WERE VICTIMIZED BY THE DAYS FRAUD SCHEME AND THE SUBSEQUENT COVER-UP BY THE CONSPIRATORS

53.     Plaintiffs Turner, Lopez, MB, and Nur came to CAIR-VA for legal representation by CAIR relating to divorce proceedings, immigration status, hostile work environment, and employment discrimination, respectively. Turner, Lopez, MB, and Nur reasonably and justifiably relied upon the Days Fraud Scheme in retaining CAIR to represent them in their respective matters. Reasonably relying upon the representations that Days was a lawyer competent to represent them, as detailed above, Turner and Lopez gave Days a total of $850 in cash and also provided services valued at $350 to Days as partial payment for his services in or about June 2007. MB wired $200 to Days via Western Union, an interstate facility, in July 2007, which included an additional service charge of $23.99.

### Plaintiff MB

54.     MB first contacted Days by telephone in February 2007 to ask that CAIR represent him in a pending administrative proceeding before the federal Equal Employment Opportunity Commission ("EEOC") relating to employment

discrimination by the City of Lynchburg. At the time, MB was 22 years old. In these conversations Days persuaded MB that he and CAIR were competent to act as his lawyer and induced MB to pay CAIR for these legal services.  MB then paid Days through a wire transfer using a Western Union facility.

55.    MB spoke to Days numerous times by telephone during the pendency of the EEOC claim. In March, in furtherance of the Days Fraud Scheme, Days sent a letter on CAIR-VA stationery by fax to the City of Lynchburg, Virginia, office of the Department of Utilities indicating that he was following up on the complaint filed by MB of employment harassment. On March 27, 2007, Timothy A. Mitchell, Director of the Department of Utilities of the City of Lynchburg sent a letter back to Days via USPS acknowledging Days' letter and that he was aware of MB's complaint with the EEOC.

56.    In or about in late April or early May 2007, MB met with Days in an Arlington, Virginia hotel where Days was attending a CAIR meeting with CAIR National employees. MB gave Days all of the documents and evidence underlying his claims of employment discrimination.

57.    In mid-May 2007, MB received notice from the EEOC that it was not pursuing his claim and that he had a "right to sue". MB informed Days of the Right-to-Sue letter. After several more telephone calls from MB to Days, Days arranged that MB would meet Days at the Richmond, Virginia train station on or about July 10, 2007. MB drove Days around to several locations including the U.S. District Court. MB would wait in his car while Days conducted his business

at the various locations. Days provided MB with what purported to be a summons for a federal lawsuit against the City of Lynchburg, his employer, against which he had a grievance. Days informed MB that CAIR required $350 to file the lawsuit. MB informed Days that he had only $250. Days responded, "No problem; don't worry about the $100; I'll put it in and when you win hook me up." MB had understood that to mean that MB would pay Days part of any judgment.

58.    Days incorrectly informed MB that the City of Lynchburg would have only ten days to respond to the lawsuit.

59.    In fact, neither CAIR nor Days filed any such lawsuit.

60.    On or about July 27, 2007, the City of Lynchburg terminated MB's employment. In August, MB filed a new claim with the EEOC for retaliatory termination.

61.    In or about mid-December 2007, MB called CAIR-VA to speak to Days about the status of his federal litigation and his new EEOC claim. Iqbal answered the telephone and, pursuant to the conspiracy to cover up the Days Fraud Scheme, informed MB that he knew nothing of these matters but would look into them and telephone MB in a few days. MB heard nothing from Iqbal and called CAIR-VA back in a few days. He spoke to Iqbal. During that telephone conversation he explained to Iqbal that he had paid Days money to file his federal lawsuit and he expected to know the status of the litigation. Iqbal, in furtherance of the conspiracy to cover up the Days Fraud Scheme, responded by

21

telling MB that he would send MB a "release form" so that CAIR could look into the matter further. At no time did Iqbal tell MB that Days was not authorized to take legal fees or costs from MB nor did he tell MB that Days was not acting with full authority as a CAIR attorney. Iqbal then caused the "release form" to be placed in the USPS to MB.

62.    A few days later, MB received the "release form" by USPS from CAIR-VA (a true and correct copy of which is attached hereto as Exhibit IV). At the top of the page is the name, "Council on American-Islamic Relations". Below that to the immediate left is "CAIR" in large bold type and "Maryland-Virginia" below that. At the right margin is an address in Bethesda, Maryland (not Herndon, Virginia). Underneath this and centered is the statement in quotation marks: "We promise, We deliver". Underneath this and centered is the purported name-type of the document: "Release Statement".

63.    This "Release Statement" purports to authorize CAIR-VA to act on behalf of the signatory in all matters relating to a claim of discrimination but it adds: "I also understand that CAIR-Maryland & Virginia is NOT a legal services organization and I will hold CAIR-Maryland & Virginia neither financially nor legally liable in respect to any subsequent judicial or administrative proceedings which may result from CAIR's involvement with my complaint."

64.    After receiving this document from CAIR-VA, MB telephoned Days to ask him why he should sign this document since CAIR and Days were in fact

22

acting as his attorneys and that they were representing MB in a federal lawsuit. Days told MB to ignore this form and not to sign it. MB did not sign the form.

65.     Sometime soon after February 10, 2008, MB telephoned CAIR-VA to speak to Days. Days was not there but he spoke instead to Iqbal. Iqbal, in furtherance of the conspiracy, informed MB that Days was no longer working at the CAIR-VA offices and that CAIR could not help him with his legal matters any further. Iqbal did not offer MB to return the monies MB had paid for the filing of the federal litigation, he offered MB no referrals for other legal counsel, and he said nothing of the Days Fraud Scheme. Iqbal did not tell MB that Days had been fired for fraud. MB asked Iqbal to send back his documents, which included a disc with a tape recording with evidence of MB's co-employees ridiculing him and a personal daily journal Days had told MB to keep in order to document any discrimination. Iqbal then caused a package of materials to be sent to MB by USPS in furtherance of the conspiracy to cover up the Days Fraud Scheme.

66.     Upon information and belief, in furtherance of the Days Fraud Scheme and the Conspirators agreement to cover it up, on or about February 14, 2008, Iqbal logged onto an Internet-based data base belonging to CAIR National, from his offices in Virginia at which time he entered information relating to MB's claims of employment harassment. Iqbal entered that the "Case Status" was closed and did not make any mention of the Days Fraud Scheme.

67.     Several days later, MB received his documents from CAIR-VA via the USPS but the recordings of the discriminatory statements and the daily journal were missing. MB immediately called CAIR-VA and spoke to the woman he (and other CAIR-VA clients) had known as Sister Iman who worked with Days at CAIR-VA and told her what was missing. She said that Days had the missing materials. In furtherance of the conspiracy to cover up the Scheme, Sister Iman said nothing else.

68.     Because neither Iqbal nor any one from CAIR had informed MB that Days had been fired, he assumed that Days was just not working at the CAIR-VA offices. MB contacted Days by telephoning Days' cellular telephone. Days informed MB that he was now working at home and pursuing private practice. MB stayed in constant telephone contact with Days during the subsequent months. MB even gave Days $50 for moving expenses as a personal loan.

69.     By August 2008, MB realized that given Days' deteriorating health situation (Days purportedly had a lung disease, diabetes, and other ailments that required him to spend long periods in the hospital), Days could not properly represent him. MB asked Days to recommend another lawyer.

70.     Soon thereafter, on or about September 9, 2008 MB learned of the Days Fraud Scheme from a researcher unrelated to CAIR. MB called Days to ask him what this was all about and whether it was true that he was not a lawyer and had not actually filed MB's federal lawsuit. Days falsely told MB that it was

just a controversy begun by "CAIR haters" and that it was nothing to worry about.

71.    A few days later Athman, CAIR's "national director" of the "civil rights division," telephoned MB in Virginia from the Washington D.C. office of CAIR National, explained that she worked at CAIR National and informed MB that Days was not an attorney and that he had committed fraud. MB asked Athman how CAIR could have hired Days in the first place without even investigating whether he was in fact a lawyer and Athman responded that she did not know how or why Days was hired, "but it was a mistake on our part." Athman asked MB how the researcher who had informed MB about the Days Fraud Scheme had contacted MB. MB instead responded by asking Athman how she had MB's telephone number. Athman informed MB that she had all of the CAIR-VA files and she found his number in those files.

72.    MB told Athman that he had paid Days to file his federal litigation. He asked her what CAIR was offering him by way of compensation. She said CAIR was offering nothing; that she was just calling to inform him that Days was not an attorney. At no time did Athman tell MB that CAIR-VA officials and CAIR National officials knew that Days had been defrauding MB since at least December 2007 and that the Conspirators had decided to cover up the Days Fraud Scheme even after the Conspirators learned that Days was not an attorney and terminated his employment with CAIR.

**Plaintiffs Turner and Lopez**

73.　Turner, on her own behalf and on behalf of Lopez, called CAIR-VA and spoke to Days in early June 2007. She was seeking a divorce from her estranged husband; her companion, Lopez, was seeking help to process his immigration papers for a work visa. During this telephone call and subsequent discussions with Days, Days fraudulently represented to Turner and Lopez that he was a licensed CAIR attorney and that he and CAIR would adequately and professionally represent Turner and Lopez in their legal matters.

74.　Soon thereafter, Turner and Lopez came to the CAIR-VA offices and retained CAIR and Days to represent them in their respective legal matters. Days informed Turner and Lopez that CAIR would require $850 for the immigration matter and $350 for the divorce.

75.　Turner and Lopez returned to the office the following day and informed Sister Iman that they wished to see Days in order to pay him the money owed for the legal work. Sister Iman ushered them to Days' office at CAIR-VA where they paid Days $750 in cash. They arranged and did in fact pay an additional $100 in cash approximately one week later. Days assured them that CAIR would send them a receipt. They never received a receipt.

76.　In addition to the cash, Turner and Lopez performed some chores at Days' home worth $350 and Days agreed that these services would satisfy the retainer amount required for the divorce.　This was in furtherance of the Days Fraud Scheme.

77.     Over the next several months and through the end of the year 2007, Turner and Lopez contacted Days by telephone but only after, on each occasion, many attempts. At one point, Sister Iman told Turner that Days was in the hospital and that Turner should contact him there. Days would continue to tell Turner that he was working on their legal matters.

78.     In furtherance of the Days Fraud Scheme, at one point in late 2007, Days sent a letter from CAIR-VA by the USPS and/or by fax to the U.S. Citizenship and Immigration Services in St. Albans, Vermont. In that letter, Days identified Lopez as "my client", explained the facts surrounding Lopez's request for Temporary Protected Status, and asked how to proceed. Days signed his name as "Mr. Morris L. Days, JD, Civil Rights Manager, CAIR Maryland/Virginia."

79.     Finally, sometime soon after February 10, 2008, Turner went to the CAIR-VA offices to inquire as to the status of her legal matters. Days was not at the office but Turner met with and spoke to Iqbal. Iqbal, in furtherance of the conspiracy to cover up the Days Fraud Scheme, told Turner that Days was no longer at the CAIR-VA offices. Iqbal did not tell Turner that Days' employment with CAIR had been terminated nor did he mention the Days Fraud Scheme.

80.     Turner then telephoned Days at his residence and Days informed Turner that he was going to be working from his home. Over the next several months, Turner attempted to reach Days on subsequent occasions to determine the status of her divorce and Lopez's immigration matter. When Turner could

27

not reach Days and after his home telephone number was disconnected, Turner called CAIR-VA and spoke to Sister Iman who told her the CAIR-VA office was in the process of closing.

81. In or about late May or early June 2008, Turner went to the CAIR-VA office and spoke to Iqbal once again. In furtherance of the Days Fraud Scheme, Iqbal simply informed Turner that the CAIR-VA office was closing and there was nothing he could do for her.

82. Soon thereafter, Turner telephoned from Virginia to CAIR National in Washington, D.C. to attempt to get some answers about her divorce and Lopez' immigration matter. She spoke to a woman who answered the telephone. Turner informed the woman that she was calling about her legal matters being handled by Days. In furtherance of the Days Fraud Scheme, the woman told Turner that Days no longer worked for CAIR. Turner then asked, "But what about my case? Days took money from us." The woman informed Turner that she needed to speak to a  man, the name of whom Turner does not presently recall. The woman transferred Turner to the man's voice mail at CAIR National. Turner left her name and telephone number.

83. Later that evening, a man telephoned Turner and told her that he was returning her call to CAIR National. He told Turner that Days no longer worked at CAIR. Turner informed the CAIR-National representative that Days had taken money for work to be done for her and Lopez. The man, in furtherance of the conspiracy, responded by saying that "Days was doing private stuff."

Turner asked the CAIR National representative what she and Lopez were to do. The man responded that Turner's only recourse was to speak with another CAIR official by the name of Osman at telephone number 410-517-4357.

84.    Turner, while in Virginia, immediately telephoned the Maryland telephone number she had been provided and spoke to a man. She again explained that Days had taken money from her and Lopez for various legal matters. The man, in furtherance of the conspiracy, told Turner that Days no longer worked at CAIR and that Days had taken her money for "private" work. This statement was false in that Days represented to Turner and Lopez that he was acting as their legal counsel as a CAIR lawyer and that the fees were being paid to CAIR for these services. The man told Turner that she would have to contact Days directly. Turner replied that she had no way of getting in touch with Days. The CAIR official told Turner that Days was in the Reston, Virginia hospital. The CAIR official said nothing else. He did not offer to return Turner and Lopez's money paid to Days nor did he inform Turner that Days was in fact not a lawyer. No further assistance or information was provided by CAIR to Turner or Lopez. At no time did any CAIR official recommend a lawyer for Turner or Lopez nor did any CAIR official inform Turner or Lopez that they should seek independent legal counsel to protect their interests.

### Plaintiff Nur

85.    Nur contacted CAIR-VA in early November 2007 by telephone after suffering employment discrimination at her place of employment, Star-Tek, Inc.

29

She spoke to Sister Iman and explained her complaint. Sister Iman falsely said that CAIR could help her and that Days would contact her.

86.     Days contacted Nur the next day by telephone and explained that he was an attorney working for CAIR. He indicated that CAIR would represent Nur. He asked Nur for information on the names and positions of her superiors at Star-Tek, Inc., including individuals who worked at corporate headquarters in Denver, Colorado. Nur provided Days with the information.

87.     Sometime thereafter, but before November 22, 2008, Days informed Nur that he had called Star Tek, Inc.'s Denver, Colorado offices to speak to a Mr. Andre Johnson who was a senior company official in the office of human resources. In furtherance of the Days Fraud Scheme, Days had called Mr. Johnson to inform him that Days was now representing Nur in her employment discrimination matter.

88.     On or about November 22, 2008, Nur attended a meeting at her place of employment to discuss with her supervisors her complaints of discrimination. At this meeting, Star Tek, Inc.'s Mr. Johnson was in attendance. He indicated that he had received a telephone call from Days. At this meeting Nur explained to the Star Tek, Inc. superiors the nature of the harassment. At this meeting, Mr. Johnson had informed Nur that if Days continued to represent her that the company could no longer communicate directly with her but only through her legal counsel. Nur indicated that she would take the matter under advisement.

89.     Nur immediately telephoned Days at CAIR-VA offices. Nur spoke to Sister Iman, explained the situation, and asked what Days advised her to do. Sister Iman told Nur she would pass the message along to Days. Sister Iman falsely assured Nur that Days would take care of the matter.

90.     A few days later, Brenda Stone, a Star Tek, Inc. human resources official from the corporate offices in Collinsville, Virginia, telephoned Nur to inform her that Star Tek, Inc. would agree to transfer Nur to another department away from the offending co-employees as a way to resolve the matter. Nur told Ms. Stone that she would get back to her with an answer.

91.     Nur immediately telephoned CAIR-VA. Days was not in but Nur spoke to Sister Iman and explained the situation and asked what Days advised her to do. Sister Iman said she would speak with Days.

92.     Soon thereafter, Sister Iman telephoned Nur and told her Days advised her not to accept the transfer as a resolution of the problems at work and that Days would resolve the matter through legal means. Days also telephoned Nur later that day and informed Nur and her husband that she should not accept the transfer; that she had a very strong case; and that Days would sue Star Tek, Inc. on her behalf.

93.     Relying upon Days' legal advice, Nur refused the transfer offered by her supervisors. Nur was informed by her superiors that as a consequence of her decision, that she would be on unpaid leave until the matter was resolved.

94.     In early December, Nur came to the CAIR-VA office to meet with Days. Days was not in at the time but met instead with Sister Iman. In furtherance of the Days Fraud Scheme, Sister Iman falsely informed Nur that Days was in court. Sister Iman assisted Nur in filing employment harassment inquiries with the Virginia Human Rights Council and the EEOC via telephone and facsimile communications.

95.     Soon thereafter, Days contacted Nur's employer by letter through the USPS on Nur's behalf and informed Star Tek, Inc., that CAIR was "a nationally recognized and well-known civil rights organization which handles complaints of religious discrimination" with a "mission . . . to defend the rights of Muslims in America." The letter suggested that "[i]f necessary, we are available to respond to and resolve the complaints filed by Ms. Abdul-Nur against Star-Tek, Inc." Upon information and belief, soon thereafter, Star Tek, Inc. officials transmitted a copy of the letter by fax or USPS to its corporate headquarters in Colorado.

96.     On January 29, 2008, Nur received a "no action" letter from the EEOC informing her that while the EEOC investigator had concluded that Nur's charges of discrimination and harassment were not violations of law, Nur had a right to bring formal administrative charges "*within 300 days of the violation*" (emphasis in the original). The letter further states that "If you file a charge, you will be able to pursue the matter further by filing suit in federal district court within 90 days of your receipt of the dismissal."

32

97.     Nur immediately faxed the EEOC "no action" letter to CAIR-VA. Nur called CAIR-VA and spoke to Sister Iman who confirmed that they received the EEOC "no action" letter and that she would give it to Days, who she said was ill at the time. Sister Iman falsely assured Nur that CAIR would represent her interests and handle the matter.

98.     Nur heard nothing from CAIR or Days until Nur telephoned in early March 2008. Days was not in the office but Sister Iman, in furtherance of the conspiracy to conceal the Days Fraud Scheme, informed Nur that Days was working on her complaint. Soon thereafter, Days telephoned Nur. He informed Nur that he was calling from the hospital and that he had been ill for some time. He assured her that we was going "to sue" Star-Tek, Inc. on her behalf. He informed Nur once again that she had a "very strong case".

99.     It was then clear to Nur that Star-Tek, Inc. was not going to permit her to return to work. She began searching for other employment. Upon information and belief, Star-Tek, Inc. officials gave at least one prospective employer bad references and the employment the prospective employer had tentatively offered her was rescinded. Nur telephoned CAIR-VA and informed Sister Iman of her fears of being "black-balled" by her employer in April 2008. Sister Iman falsely assured her that CAIR would look into it. In furtherance of the Days Fraud Scheme and the cover-up, Sister Iman failed to inform Nur that Days' employment with CAIR had been terminated.

100.    Nur and her family (including her husband and two young children) were under extreme financial and emotional distress due to the situation in which she found herself. She had been on a formal leave of absence without pay from Star Tek, Inc. since November 22, 2007. She had refused the reassignment as a way to resolve the matter after following Days' advice. She had filed employment discrimination cases at the state and federal level but they had been preliminarily rejected. She was now depending on Days and CAIR to represent her and CAIR representatives were assuring her that CAIR would sue on her behalf to protect her interests.

101.    In May 2008, Nur and her family were forced to relocate to North Carolina in order to find employment. Nur and her family were suffering extreme emotional distress due to the situation. After Nur had called CAIR-VA and left messages to tell CAIR of her move and to learn of the status of her legal matters, on May 2, 2008, Sister Iman telephoned from Virginia to Nur in North Carolina. Nur informed Sister Iman of the new circumstances and to learn of the status of her lawsuit.

102.    On this occasion Nur spoke to Sister Iman who falsely told her that Days was no longer working at CAIR but that CAIR National was following through on her complaint. Sister Iman, in furtherance of the conspiracy to conceal the Days Fraud Scheme, informed Nur that CAIR National was now preparing an "appeal" from the denial of Nur's complaint and that Nur needed to

fax to CAIR an authorization for CAIR to represent Nur in her "appeal". Nur did so that same day from North Carolina.

103.    Nur, while in North Carolina, telephoned and left several messages at the CAIR-VA office over the ensuing weeks. Sister Iman telephoned from Virginia to Nur in North Carolina in July 2008 and put some CAIR-VA official on the telephone who falsely said he was reviewing the case and that he would keep Nur informed of any developments. He assured Nur that CAIR would vigorously represent her interests. In fact, no CAIR attorney or other staff member was representing Nur's interests. In furtherance of the conspiracy to conceal the Days Fraud Scheme, neither Sister Iman nor this other CAIR-VA official mentioned to Nur that Days was not a lawyer and that she had been misled to believe that CAIR had filed or was planning to file an administrative appeal or lawsuit on her behalf.

104.    Later that same month, Sister Iman, in furtherance of the conspiracy to conceal the Days fraud Scheme, called Nur in North Carolina to inform her that the CAIR-VA office was now permanently closed down and that her files had been sent to CAIR National in Washington, D.C., which would be handling her case.

105.    Nur has heard nothing from CAIR or any official from CAIR National since that last telephone call from Sister Iman. In fact, CAIR has filed neither an administrative appeal nor a lawsuit on Nur's behalf. Nur did not

discover that she had been defrauded until she was contacted by an independent researcher looking into the Days Fraud Scheme.

**The Fraud Continues: CAIR's September 9, 2008 Press Release**

106.    On or about September 9, 2008, CAIR National Management published on the CAIR National web site a press release responding to a widely published report of the Days Fraud Scheme the ("the CAIR 9-9 Press Release"). In the CAIR 9-9 Press Release, the defendants, in furtherance of the conspiracy to conceal the Days Fraud Scheme, continues to misrepresent and omit material facts to the general public and to the plaintiffs and other CAIR victim/clients about the Days Fraud Scheme by distorting and falsifying the material facts about it.

107.    Specifically, the CAIR 9-9 Press Release claims that Days was terminated immediately after the Days' fraud was discovered. As set forth above, this is false. The CAIR 9-9 Press Release also claims that "[i]n an effort to rectify the situation, CAIR-MD/VA reached out to those defrauded to offer compensation. The victims were also directed to outside attorneys for assistance in their individual cases." This is false since at best only some clients were directed to other legal counsel and even in those cases this statement is misleading and omits material facts as set forth above. Moreover, upon information and belief, CAIR only directed some of the CAIR victim/clients who refused to work with CAIR to other attorneys and never advised their victimized

clients who signed the Release of Claims Document that they should seek independent legal advice regarding potential claims against CAIR.

108.    Further, the CAIR 9-9 Press Release describes the Release of Claims Document, the Silence Clause, and the Liquidated Damages Clause as "standard legal practice in such situations". This is false and is further evidence that CAIR, as a PILF, is providing fraudulent legal opinions to the general public, to the plaintiffs, and to all their former victimized clients – to wit, that CAIR acted properly in reaching out to the victims/clients of the CAIR Fraud Scheme.

109.    At all relevant times, the defendants' carried out the Days Fraud Scheme knowingly, willfully, and with the specific intent to defraud the plaintiffs and further acted knowingly and willfully to cover up the Days Fraud Scheme. The plaintiffs Turner, Lopez, MB, and Nur reasonably and justifiably relied upon the Days Fraud Scheme and the acts in furtherance of the Days Fraud Scheme and the subsequent cover-up by the defendants and were damaged thereby.

110.    All of the acts described above and attributed to Days were carried out in his capacity as an employee and/or agent of CAIR-VA and carried out within and arising from the ordinary course of Days' responsibilities and employment at CAIR-VA and/or within the scope of his authority as the "manager" and "resident" attorney in the CAIR-VA civil rights department.

111.   In addition to all of the acts described above and attributed directly to CAIR National, CAIR-VA was operated and controlled ultimately by CAIR National and treated as a wholly owned subsidiary and/or related entity and/or alter ego. Upon information and belief, decisions relating to the opening of CAIR-VA, its funding, the staffing of its executives, promotional materials, its operations, and its closing were ultimately controlled by CAIR National.

## CAUSES OF ACTION

### COUNT ONE—CONSPIRACY TO VIOLATE RICO

112.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

113.   This count is brought by the plaintiffs Turner, Lopez, MB, and Nur against defendants Iqbal, Awad, Goraya, Athman, Khalili, Hooper, and Rubin (collectively the "RICO Defendants") alleging a cause of action under 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).[2]

114.   At all relevant times, the plaintiffs and RICO Defendants were "persons" pursuant to § 1961(3).

115.   At all relevant times, CAIR National, a corporation, was an "enterprise" pursuant to § 1961(4).

116.   At all relevant times, CAIR-VA, a corporation, was an "enterprise" pursuant to § 1961(4).

---

[2] Citations to RICO will hereafter be made as "§____", omitting Title 18 of the U.S. Code.

117.    At all relevant times, the two corporations engaged in, and their respective activities affected, interstate and foreign commerce, pursuant to § 1961(4).

118.    All of the USPS mailings and the numerous telephone calls, faxed communications, e-mails and internet postings on the CAIR National web site set forth above were made in furtherance of the Days Fraud Scheme and the subsequent cover-up by the defendants.  Therefore all of these communications were made in violation of the mail and wire fraud statutes.  The plaintiffs were defrauded by one or more of these mails and wires.  This pattern of mails and interstate wire-communications occurred over a period of 27 months from the date the Days Fraud Scheme began when Days was employed by CAIR-VA as its "resident attorney" through the CAIR 9-9 Press Release published on the CAIR National website in September 2008, all in furtherance of the Days Fraud Scheme and the conspiracy by the Conspirators to engage in a massive cover-up. The Days Fraud Scheme and cover-up victimized many persons in addition to the plaintiffs.

119.    As detailed above, each of the RICO Defendants agreed to the Days Fraud Scheme, and also, to further perpetrate it, by covering it up, through the two RICO enterprises, CAIR National and CAIR-VA.

120.    As detailed above, all of the RICO Defendants were in managerial positions in the CAIR National and/or CAIR-VA enterprises and also directed

39

subordinates, including Sister Iman, to carry out the Days Fraud Scheme, which they did.

121. Accordingly, each RICO Defendant agreed to participate in the affairs of one of the CAIR enterprises through the commission of the Days Fraud Scheme and its cover-up, which is a pattern of racketeering activity (mail and wire fraud).

122. Thus, plaintiffs assert claims against all RICO Defendants for conspiring to violate § 1962(c), which prohibits any person employed by or associated with an enterprise from participating in the affairs of the enterprise through a pattern of racketeering activity.

123. This conspiracy to violate § 1962(c) is a violation of § 1962(d).

## RICO PRAYER FOR RELIEF

### DAMAGES:

124. As a result of the above-described racketeering activity, plaintiffs Turner and Lopez have been collectively damaged in their business and/or property in an amount of no less than $1,150 and MB in an amount of no less than $273.99. Plaintiff Nur's damages to her business and/or property were proximately caused by her following Days' advice not to accept a transfer to another department, which resulted in the effective termination of her employment with Star Tek, Inc. The damages to her business and/or property,

include $7,425 in lost wages and approximately $1,500 for moving expenses to relocate to North Carolina to find alternative employment.

125.    Pursuant to § 1964(c), the plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees from the RICO defendants.

### INJUNCTIVE RELIEF:

126.    Pursuant to § 1964(a), the plaintiffs are entitled to appropriate injunctive relief to prevent and to restrain future RICO violations, including but not limited to an order by the Court (a) to require the immediate dissolution of CAIR National and CAIR-VA and all of their offices and branches, (b) to require all of the defendants to cease any and all association with CAIR and/or any other PILF or "civil rights organization" which provides any form of legal advice and/or referral service, and (c) to require that CAIR National, the defendants, and all of the CAIR offices and branches turn over any and all information relating to legal malpractice, fraud, breach of duty, and other criminal, civil, and/or administrative violations to the appropriate bar associations and to local, state, and federal law enforcement agencies.

### COUNT THREE—VIOLATIONS OF DCCPPA: D.C. CODE § 28-3901 ET SEQ.

127.    Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

128.    This count is brought by plaintiffs against all of the defendants alleging a cause of action under the DCCPPA, D.C. Code § 28-3905(k)(1). Specifically, plaintiffs allege that they have been damaged as a result of the

fraudulent acts as set forth above and that this Count Three arises from the purchase of, transfer of, and/or providing information about the offering of consumer services in the ordinary course of business as those terms are defined by the DCCPPA.

129.    At all relevant times, all of the defendants were "persons" within the meaning of D.C. Code § 28-3901(a)(1).

130.    At all relevant times, Plaintiffs Turner, Lopez, MB and Nur were and are "persons" within the meaning of D.C. Code § 28-3901(a)(1).

131.    At all relevant times, CAIR National and all of the other defendants operated as "persons" within the meaning of D.C. Code § 28-3901(a)(1).

132.    At all relevant times, CAIR-VA, CA National, and CAIR represented to the public and in fact conducted their individual and collective affairs as a PILF which provided legal services and representation in the "ordinary course of business" as that term is generally used in the DCCPPA.

133.    The defendants, each separately and collectively as members, associates, or participants in CAIR, conducted trade practices in violation of the law of the District of Columbia. Specifically, defendants violated D.C. Code §§ 28-3904(a), (b), (d), (e), (f), (g), (h), (i), (m), (s), (u), and (v).

134.    As a result of CAIR National and the other defendants' violation of the DCCPPA, plaintiffs have suffered financial damages and other damages arising from the Days Fraud Scheme.

135.   As a result of its misconduct, the defendants are liable to plaintiffs for their losses in an amount to be determined at trial.

136.   Pursuant to D.C. § 28-3905(k)(1)(A), plaintiffs are entitled to recover threefold their damages, or $1,500 per violation, whichever is greater from the defendants.

137.   Pursuant to D.C. § 28-3905(k)(1)(B), plaintiffs are entitled to recover reasonable attorney's fees from the defendants.

138.   Pursuant to D.C. § 28-3905(k)(1)(C), plaintiffs are entitled to recover punitive damages from the defendants insofar as the fraudulent acts set forth above amounted to egregious and intentional and/or reckless conduct carried out by the defendants as fiduciaries against plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters to the defendants under false pretenses.

139.   Pursuant to D.C. § 28-3905(k)(1)(D), plaintiffs are entitled to seek an injunction against the use of the unlawful trade practices set forth above.

140.   Pursuant to D.C. § 28-3905(k)(1)(E), plaintiffs are entitled to such other additional relief as may be necessary to restore to the plaintiffs money or property, which may have been acquired by means of the unlawful trade practices set forth above.

141.   Pursuant to D.C. § 28-3905(k)(1)(F), plaintiffs are entitled to any other relief which the Court deems proper.

**COUNT FOUR—VIOLATIONS OF VCPA: VA. CODE ANN. § 59.1-196 ET SEQ.**

142.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

143.   This count is brought by plaintiffs Turner, Lopez, and MB against all of the defendants alleging a cause of action under the VCPA, Va. Code Ann § 59.1-204. Specifically, plaintiffs allege that they have been damaged as a result of the fraudulent acts as set forth above and that this Count Four arises from the advertisement, sale, or offering for sale services to be used primarily for personal, family, or household purposes as those terms are defined by the VCPA.

144.   At all relevant times, all of the defendants were "persons" within the meaning of Va. Code Ann. § 59.1-198.

145.   At all relevant times, Plaintiffs Turner, Lopez, and MB were and are "persons" within the meaning of Va. Code Ann. § 59.1-198.

146.   At all relevant times, CAIR National and all of the other defendants were "persons" within the meaning of Va. Code Ann. § 59.1-198.

147.   At all relevant times, CAIR National, CAIR, and all of the other defendants  operated individually and collectively as "suppliers" within the meaning of Va. Code Ann. § 59.1-198.

148.   At all relevant times, CAIR-VA, CA National, and CAIR represented to the public and in fact conducted their individual and collective affairs as a PILF which advertised, offered for sale, and in fact provided legal

services to be used primarily for personal, family, and/or household purposes as those terms are defined and used in the VCPA.

149. At all relevant times, the defendants, each separately and collectively as members, associates, or participants in CAIR, conducted consumer transactions as that term is defined in Va. Code Ann. in § 59.1-198.

150. At all relevant times, the defendants, each separately and collectively as members, associates, or participants in CAIR, engaged in unlawful fraudulent acts and/or practices in violation of the VCPA. Specifically, defendants violated §§ 59.1-200(A)(1)-(3), (5)-(6), (8), and (14).

151. As a result of CAIR National and the other defendants' violation of the VCPA, plaintiffs have suffered financial damages and other damages arising from the Days Fraud Scheme.

152. As a result of its misconduct, the defendants are liable to plaintiffs for their losses in an amount to be determined at trial.

153. Pursuant to Va. Code Ann. § 59.1-204(A), because the fraudulent acts set forth above were carried out by the defendants willfully, plaintiffs are entitled to recover threefold their damages, or $1,000 per violation, whichever is greater from the defendants.

154. Pursuant to Va. Code Ann. § 59.1-204(B), plaintiffs are entitled to recover reasonable attorneys' fees and court costs from the defendants.

## COUNT FIVE—COMMON LAW FRAUD AND AIDING & ABETTING FRAUD

155.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

156.   This count is brought by plaintiffs against all of the defendants alleging a cause of action for common law actual fraud, constructive fraud, aiding and abetting actual fraud and/or aiding and/or abetting constructive fraud under the common law of the Commonwealth of Virginia and/or the District of Columbia.

157.   As set forth above, CAIR National and the other defendants damaged plaintiffs through their fraudulent acts.

158.   As set forth above, CAIR National and the other defendants aided and abetted the Days Fraud Scheme because they knew of the Days Fraud Scheme and because they provided substantial assistance as set forth above in carrying out the Days Fraud Scheme.

159.   Each of the defendants separately and all of the defendants collectively are liable for all of the damages caused by their own respective fraudulent acts and, as a result of their aiding and abetting the Days Fraud Scheme, for all of the damages caused to plaintiffs by the Days Fraud Scheme.

160.   Each of the defendants separately and all of the defendants collectively are liable for punitive damages arising from their fraudulent acts insofar as their conduct in furtherance of their fraudulent acts as set forth above amounted to egregious and intentional and/or reckless conduct carried out by the

46

defendants as fiduciaries against plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters to the defendants under false pretenses.

COUNT SIX—BREACH OF FIDUCIARY DUTIES

161.    Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

162.    This count is brought by plaintiffs against all of the defendants alleging a cause of action for breach of fiduciary duties under the common law of the Commonwealth of Virginia and/or the District of Columbia.

163.    As set forth above, CAIR National and the defendants acted as a nationwide PILF and were in the position of fiduciaries to plaintiffs and as such owed plaintiffs the utmost duty of care.

164.    As set forth above, the defendants wrongful conduct arising out of the Days Fraud Scheme breached this duty of care. Specifically, the defendants wrongful conduct constituted multiple violations of the DCRPC and other relevant codes of professional responsibility.

165.    As set forth above, CAIR National and the other defendants damaged plaintiffs through their breach of fiduciary duties.

166.    As set forth above, CAIR National and the other defendants aided and abetted the breach of fiduciary duties because they knew of the Days Fraud Scheme and because they provided substantial assistance as set forth above in carrying out the Days Fraud Scheme.

167. Each of the defendants separately and all of the defendants collectively are liable for all of the damages caused by their own respective wrongful acts constituting breach of the fiduciary duties they owed plaintiffs and, as a result of their aiding and abetting this breach of fiduciary duties, for all of the damages caused to plaintiffs thereby.

168. Each of the defendants separately and all of the defendants collectively are liable for punitive damages arising from their wrongful acts constituting breach of fiduciary duties insofar as their conduct in furtherance of their wrongful acts as set forth above amounted to egregious and intentional and/or reckless conduct carried out by the defendants as fiduciaries against plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters to the defendants under false pretenses.

## COUNT SEVEN—INFLICTION OF EMOTIONAL DISTRESS

169. Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

170. This count is brought by plaintiffs against all of the defendants alleging a cause of action for intentional infliction of emotional distress under the common law of the Commonwealth of Virginia and/or the District of Columbia.

48

171.    As set forth above, the wrongful conduct of CAIR National and the defendants arising out of the Days Fraud Scheme was (a) intentional and/or reckless and (b) outrageous and intolerable.

172.    At all relevant times, plaintiffs had entrusted sensitive, personal, and potentially valuable legal matters to the defendants, who had held themselves out to plaintiffs as a PILF and as fiduciaries to plaintiffs. As set forth above, plaintiffs were defrauded by the defendants and the defendants engaged in a pattern of criminal conduct directed against the defendants in violation of federal and state law and in violation of their fiduciary duties to plaintiffs.

173.    As a direct result of the defendants outrageous and intolerable wrongful conduct described above, plaintiffs suffered severe emotional distress and have been damaged thereby.

174.    Each of the defendants separately and all of the defendants collectively are liable for all of the damages caused by their own respective wrongful acts constituting intentional infliction of emotional distress upon plaintiffs and, as a result of their aiding and abetting the wrongful acts set forth above, for all of the damages caused to plaintiffs thereby.

175.    Each of the defendants separately and all of the defendants collectively are liable for punitive damages arising from their wrongful acts constituting intentional infliction of emotional distress insofar as their conduct in furtherance of their wrongful acts as set forth above amounted to egregious and intentional and/or reckless conduct carried out by the defendants as

fiduciaries against plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters to the defendants under false pretenses.

### COUNT EIGHT—CONVERSION

176.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

177.   This count is brought by the Plaintiffs Turner, Lopez, and MB who paid monies to Days and CAIR-VA  as a result and in reliance upon the Days Fraud Scheme (the "Paying Clients") against all of the defendants alleging a cause of action for conversion under the common law of the Commonwealth ofVirginia and/or the District of Columbia.

178.   As set forth above, Days engaged in the wrongful exercise and/or assumption of authority over the Paying Clients' legal fees depriving them of their possession. Further, Days engaged in a course of conduct that included acts of dominion wrongfully exerted over the Paying Clients' funds paid to Days as legal fees in denial of the Paying Clients' rights, and/or inconsistent with their rights.

179.   As set forth above, Days' conduct is attributable to CAIR-VA through the doctrines of respondeat superior, agency, ratification, non-delegable duties, breach of fiduciary duty, waiver, conspiracy, and aiding and abetting.

180.   As set forth above, Days and CAIR-VA's conduct is attributable to CAIR National and the other defendants through the doctrines of respondeat

superior, agency, ratification, non-delegable duties, breach of fiduciary duty, waiver, conspiracy, and aiding and abetting.

181.   Each of the defendants separately and all of the defendants collectively are liable for all of the damages caused by the conversion of the Paying Clients' funds as set forth above and, as a result of their aiding and abetting the conversion of the Paying Clients' funds, for all of the damages caused to the Paying Clients for the conversion of their funds.

182.   Each of the defendants separately and all of the defendants collectively are liable for punitive damages arising from the conversion of the Paying Clients legal fees insofar as the wrongful acts set forth above amounted to egregious and intentional and/or reckless conduct carried out by the defendants as fiduciaries against plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters and funds to the defendants under false pretenses.

## COUNT NINE—UNJUST ENRICHMENT

183.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

184.   This count is brought by the Plaintiffs Turner, Lopez, and MB as a result and in reliance upon the Days Fraud Scheme against all of the defendants alleging a cause of action for unjust enrichment under the common law of the Commonwealth ofVirginia and/or the District of Columbia.

185.   For all of the reasons set forth above, this Court should exercise its equitable powers and impose a constructive trust on the defendants' assets in order to return all of the legal fees paid by the Paying Clients to Days.

## PRAYERS FOR RELIEF

186.   **WHEREFORE**, plaintiffs Turner, Lopez, MB, and Nur pray for judgment and relief as follows, where applicable:

187.   Awarding compensatory damages in favor of plaintiffs against all defendants for the damages sustained as a result of the wrongful conduct alleged and as will be established through discovery and/or at trial, together with interest thereon.

188.   Awarding treble damages, attorneys' fees, and costs in favor of plaintiffs against all defendants for the damages sustained in violation of RICO, the DCCPPA, and the VCPA as alleged herein.

189.   Awarding punitive damages to plaintiffs against all of the defendants for the egregiously wrongful conduct alleged herein.

190.   Granting declaratory and/or injunctive relief as appropriate.

191.   Imposing a constructive trust as appropriate.

192.   Granting restitution to plaintiffs. And,

193.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

All plaintiffs hereby demand a jury trial.

53

**DATED:** November __, 2008.    Respectfully submitted,


DAVID YERUSHALMI


By _____
        David Yerushalmi

David Yerushalmi
District of Columbia Bar No. 978179
LAW OFFICES OF DAVID YERUSHALMI
P.O.B. 6358
Chandler, Arizona 85246
david.yerushalmi@verizon.net
Tel: (646) 262-0500
Fax: (801) 760-3901